UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DAVID FERRIS, II,

        Plaintiff,

                                 CASE NO. 1:15-CV-680

v.

                                 HON. ROBERT J. JONKER

CITY OF CADILLAC, *et al.*,

        Defendants.

_____/


## OPINION

### INTRODUCTION

    Kalla Fisher was nineteen months old when she died in Plaintiff's home on February 16, 2013.[1]  The autopsy reports that Kalla's death was homicide based on traumatic head injuries. Plaintiff David Ferris, the boyfriend of Kalla's mother at the time of Kalla's death, was charged with open murder.  The prosecutor ultimately dropped the charges, however, after considering the opinions of Plaintiff's experts that the medical data did not rule out a determination that Kalla's death was an accident.  Plaintiff's remaining claims[2] are against the medical professionals who reached a different conclusion.  The Court concludes these Defendants are entitled to qualified immunity.  Not a single professional in the criminal case, or this civil case, has ever opined that Kalla's death was accidental.  Nor has any professional in either case ever identified any way in

---

[1]Kalla was formally pronounced dead at the hospital following transport from Plaintiff's home.

[2]The claims against Defendants County of Wexford and Dr. Fred Wreford, and Defendants City of Cadillac and Todd Golnick, have been settled and dismissed with prejudice.  (ECF Nos. 149, 155.)

which the autopsy or other medical records were fabricated, altered, or spoiled. The case simply presents three experts (the Defendants) who believe – and continue to believe – Kalla's death was homicide; no experts who opine Kalla's death was accidental; and two experts for Plaintiff who opine that the medical record cannot rule out an accidental death. Qualified immunity protects the professional Defendants who presented their honest opinions in the course of their work, even though the prosecutor ultimately decided not to pursue a criminal case.

BACKGROUND[3]

A.   *Kalla's Initial Fall*

In January of 2013, Kalla Fisher fell down basement stairs and struck her head on cement. (ECF No. 197-2. PageID.5658.)[4]  Kalla was almost nineteen months old at the time.  (*Id.*)  Plaintiff David Ferris, then the boyfriend of Kalla's mother, Jesse Fisher,[5] was babysitting Kalla when the fall occurred.  Jesse returned approximately twenty minutes later, and Plaintiff told Jesse about the fall. He noted that there had been some swelling on top of Kalla's head and that application of ice reduced the swelling.  (*Id.*, PageID.5658.)  Plaintiff and Jesse checked on Kalla throughout the night to make sure she was okay.  (*Id.*, PageID.5664.)  The next morning, Jesse noticed a small amount of swelling and some yellowish bruising before she took Kalla to daycare.  (*Id.*, PageID.5663.)  Later in the day, the daycare provider contacted Jesse and told her that the bruising and swelling had

---

[3] The parties generally agree on the background circumstances of the case.  To the extent of any disagreement, the Court accepts as true Plaintiff's version of the background facts solely for the purpose of the summary judgment analysis.  The Court makes no findings of fact in this Opinion.

[4] Kalla had a congenital eye condition, Duane Syndrome, a form of strabismus that affected her vision.

[5] Jesse Fisher later married Plaintiff and changed her name to Jesse Ferris.

worsened.  (*Id.*)  Jesse picked up Kalla and took her to the emergency room at Mercy Hospital.  (*Id.*, PageID.5658.)  Medical records reflect that a CT-scan was performed and found no skeletal fractures or dislocations.  (*Id.*, PageID.5659.)  The record of the scan also notes that motion had compromised the examination and that "no acute intracranial abnormality [was] identified."  (*Id.*, PageID.5660.)  As mandatory reporters, emergency room personnel reported the incident to the Grayling Police Department and CPS for investigation.  (*Id.*, PageID.5662.)

Kalla's pediatrician, Dr. Joanna Nigrelli, conducted a follow-up examination the next day.  (*Id.*, PageID.5749.)  Dr. Nigrelli examined Kalla and diagnosed her with "a head contusion and the bruising or ecchymosis related to that contusion."  (*Id.*, PageID.5749.)  Dr. Nigrelli saw no need to hospitalize Kalla and did not order an MRI.  (*Id.*)  Dr. Nigrelli reported to CPS that Dr. Nigrelli did not think child abuse caused the injury.  (*Id.*, PageID.5664.)  Based on Dr. Nigrelli's report and other aspects of its investigation, CPS determined that the "injury appears to be an accident" (*Id.*, PageID.5674).  In light of the CPS findings, as well as its own investigation, the Grayling Police Department concluded the complaint of possible child abuse was unfounded.  (*Id.*, PageID.5664.)

B.    *Kalla's Death*

Kalla died in Plaintiff's home the morning of February 16, 2013.[6]  The night before, Jesse put Kalla to bed at around 8:30.  (*Id.*, PageID.6041.)  At around 11:15, Plaintiff heard his seven year-old daughter, Tessa, and Kalla talking in the bedroom where they and Plaintiff's two other children were to sleep.  (*Id.*)  Plaintiff allowed Tessa and Kalla to join him in the room where he was watching television.  (*Id.*)  At approximately midnight, Kalla vomited.  (*Id.*)  After cleaning Kalla

---

[6] Plaintiff notes that earlier that week Jesse had begun a move from her residence in Grayling, Michigan, to Plaintiff's home in Cadillac, Michigan, and that Jesse and Kalla were staying overnight at Plaintiff's home.  (ECF No. 197, PageID.5564.)

up, Plaintiff put Kalla and Tessa to bed, and then went to bed for the night.  (*Id.*)  The next day, at

8:15 a.m., the other three children were awake, but it appeared to Plaintiff that Kalla was still

sleeping.  (*Id.*)  Jesse checked on Kalla around 9:15 a.m. and found her non-responsive.  (*Id.*)  Jesse

observed vomit on Kalla's face and pillow.  (*Id.*, PageID. 5598.)  Plaintiff and Jesse called 911.  (*Id.*,

PageID.6041.)  Plaintiff performed CPR at the direction of the 911 operator.  (*Id.*)  Emergency

responders arrived, attempted resuscitation, and took Plaintiff to Mercy Hospital in Cadillac,

Michigan, by ambulance.  (*Id.*)  Plaintiff was pronounced dead at approximately 10:13 a.m.  (*Id.*,

PageID.5598.)

C.    *Kalla's Autopsy*

The Wexford County Medical Examiner, Dr. Fred Wreford, assigned responsibility for

Kalla's autopsy to Defendant Sparrow Health System ("Sparrow").  (*Id.*, PageID.5600.)  Defendant

Dr. Joyce de Jong, a forensic pathologist employed by Sparrow, was tasked with performing the

autopsy.  *(Id.)*  Dr. de Jong performed the autopsy on Sunday, February 17, 2013, with two autopsy

assistants and Cadillac Police Department Detective Todd Golnick in attendance.  (ECF 201-2,

PageID.9509.)  Dr. de Jong's Autopsy Report issued on April 26, 2013.  (*Id.*, PageID.9516.)  (ECF

No.210-2, PageID.9517-18.)  The Autopsy Report includes an addendum report (the "Addendum")

that Dr. Rudolph J. Castellani, a pathologist, prepared.  (*Id.*, PageID.9518.)  The Addendum

summarizes the results of a neuropathology consultation Dr. Castellani conducted.  (*Id.*)

Dr. de Jong's findings after performing Kalla's autopsy examination include, without

limitation: (1) acute head trauma, including bilateral subdural hemorrhage, acute subarachnoid

hemorrhage, retinal and optic nerve sheath hemorrhages, and cerebral edema and tonsillar herniation;

and (2) multiple cutaneous injuries, including multiple contusions of the face, scalp, and neck;

4

anterior chest wall contusion; superior gluteal contusion; right forearm abrasion; left arm contusion; and multiple right forearm contusions. (*Id.*, PageID.9509.) The Autopsy Report notes that Kalla had Duane's Syndrome, an eye movement disorder. (*Id.*) The Autopsy Report notes that the skull is free of fractures and that the brain appears swollen. (*Id.*, PageID.9513.) In a section of the Autopsy Report with the heading "Opinions," Dr. de Jong identifies the cause of death as "Traumatic Head Injuries" and the manner of death as "Homicide." (*Id.*, PageID.9510.)

The Addendum details Dr. Castellani's "final neuropathologic diagnoses" as (1) acute head trauma, with bilateral subdural hemorrhage, patchy acute subarachnoid hemorrhage, bilateral intraretinal and optic nerve sheath hemorrhages, and bilateral optic nerve sheath hemorrhage; (2) cerebral edema and tonsillar herniation secondary to acute head trauma." (*Id.*, PageID.9518.) The Addendum concludes with Dr. Castellani's comment that "the findings indicate inflicted head trauma resulting in death." (*Id.*)

Kalla's death certificate specifies the causes of her death as cerebellar herniation occurring minutes before death; bilateral subdural hematomas and multiple blunt force traumas occurring hours before death; and child abuse occurring weeks before death. (*Id.*, PageID.6146.) The death certificate identifies the manner of death as homicide. (*Id.*) That remains the conclusion on Kalla's death certificate to this day.

### D. Investigations and Medical Opinions

Wexford County Prosecutor Anthony Badovinac learned of Kalla's death from Det. Todd Golnick, who called Mr. Badovinac to tell him that he intended to attend Kalla's autopsy and that her death might have resulted from child abuse. (ECF No.210-19, PageID.10086.) Det. Golnick was present throughout the autopsy examination. According to Det. Golnick, Dr. de Jong told him that

5

her conclusion was that Kalla died from "a head injury caused by blunt trauma" and that "it would have been inflicted by an adult-sized person." (ECF No. 199-14, PageID.7275.) Dr. de Jong told Det. Golnick the "injuries she observed were acute and not chronic . . . that they would have happened very recently." (*Id.*, PageID.7276.)

The police, the county prosecutor's office, and CPS investigated the circumstances of Kalla's death over the course of months. While these investigations were underway, a family acquaintance, Dr. Aaron Ormsby, reviewed Kalla's medical records at the request of Kalla's grandparents. Dr. Ormsby, a board certified pathologist and the Division Head of Anatomic Pathology at Henry Ford Hospital, issued a written opinion dated February 12, 2014. (ECF No. 206-3, PageID.9067.) Dr. Ormsby's report questioned the conclusions in the Autopsy Report regarding the causes and manner of Kalla's death. Dr. Ormsby noted that he was "in complete agreement [with the autopsy findings] that there is extensive bilateral subdural hemorrhage which is clearly evident on the gross photographs . . . [and] clotted blood over the calvarium and within the sulcl [sic] of the left and right parietal region." (*Id.*) But he saw other potential explanations for Kalla's death: "namely, the contribution of Kalla's strabismus, familial bleeding tendency[7] and her playful age." (*Id.*, PageID.9068.)

Jennifer Helsel, then a CPS worker assigned to the Ferris file, requested that Dr. Schmidt, a forensic pathologist, review the circumstances of Kalla's death.[8] On February 12 2014,

---

[7]Medical testing revealed that Kalla did not have the familial bleeding tendency Dr. Ormsby mentions. (ECF No. 210-16, PageID.9901.)

[8]Dr. Schmidt has been the Chief Medical Examiner for Wayne County since 2003. (ECF No. 210-6, PageID.9545.) In conjunction with this role, he is also an associate professor at the University of Michigan and a deputy medical examiner for Washtenaw County. (*Id.*) Dr. Schmidt is also a medical examiner for Monroe County. (*Id.*, PageID.9546.) Dr. Schmidt also provides outside consulting services for which he bills independently. (*Id.*)

Dr. Schmidt issued his report.  In preparing the report, Dr. Schmidt reviewed Kalla's autopsy report, autopsy pictures, emergency room records from February 16, 2013, and records from law enforcement agencies and CPS.  (ECF No. 210-3, PageID.9535.)  Dr. Schmidt's findings paralleled those of Dr. de Jong.  (*Id*, PageID.9535-36.)  He concluded that "this 19 month-old female suffered multiple blunt trauma, mainly to the head, and is the cause of death.  The appearance of the injuries indicate that they happened acutely."  Dr. Schmidt opined that "[t]he clinical history, i.e., found dead in the morning without an explanation for the multiple blows, subdural hemorrhage and swelling of the brain, indicates that this child was a victim of child abuse and hence appropriately certified as homicide."  (*Id.*, PageID.9536.)

  E.  *The Criminal Case*

  Det. Golnick later contacted Dr. Schmidt at Mr. Badovinac's request.  (ECF No. 200-7, PageID.7737.)  Upon learning that Dr. Schmidt concurred with Drs. de Jong and Castellani about the cause of Kalla's death, Prosecutor Badovinac decided to charge Mr. Ferris with open murder. (*Id*., PageID.7737.)

  At the Preliminary Examination, Dr. de Jong was asked how Kalla died.  (ECF No. 210-16, PageID.9901.)  Dr. de Jong replied, "I can say that she sustained blunt force injuries and lethal head injuries."  (*Id.*)  She testified that the cause of death was "traumatic head injuries" that were "recent injuries" occurring minutes to hours before Kalla's death.  (*Id.*, PageID.9898-99.)  Dr. de Jong testified that she "believe[s] [Kalla's] injuries were intentionally inflicted."  (*Id.*, PageID.9962.) Asked whether a seven year old could have caused the lethal impact, Dr. de Jong responded, "I don't believe that" (*Id.*, PageID.9964) and, when asked again, "I don't believe so."  (*Id.*, PageID.9965.) Dr. Ormsby also testified at the Preliminary Examination.  He opined that Kalla "had a major trauma

when she fell down the stairs in January . . . [and that] what actually happened on that night is she had a massive intracranial bleed that led to an increased intracranial pressure that led to her demise." (*Id.*, PageID.9985.)  At the close of the Preliminary Examination, the court bound Mr. Ferris over for trial.  (*Id.*, PageID.10006.)

Mr. Ferris's counsel in the criminal case requested that Dr. L. J. Dragovic, a forensic pathologist and neuropathologist, review the Autopsy Report and other medical records.  (ECF No. 210-14, PageID.9847.)  Based on his review, Dr. Dragovic found that "the toddler Kalla Fisher died of bronchopneumonia complicating her head trauma.[9]  What remains unclear is when the toddler sustained the head trauma."  (*Id,*, PageID.9848.)  Dr. Dragovic saw no evidence of an intentional infliction of head trauma in the materials he reviewed.  (*Id.*)  He described Dr. Castellani's review as an "incomplete professional diagnostic work-up."  (*Id.*, PageID.9849)  Wexford County Prosecutor Badovinac and Assistant Prosecutor Trautner, along with Mr. Ferris's then-counsel, met with Dr. Dragovic in September 2014.  (ECF No. 200-7, PageID.7702.)  Dr. Dragovic advised them that in his opinion, an earlier injury caused Kalla's death.  (*Id.*)  After talking with Dr. Dragovic, the prosecutors decided to re-evaluate whether to pursue the criminal case against Mr. Ferris.  (*Id.*)

Mr. Badovinac forwarded Dr. Dragovic's report to Dr. Schmidt via e-mail and asked for his comments.  (ECF No. 210-5, PageID.9540.)  Dr. Schmidt reiterated his opinion that "this girl was killed.  Period.  She was beaten to death . . . .  The subdural hemorrhage is textbook child abuse."

---

[9]The Court notes that no other medical expert has identified pneumonia as contributing to Kalla's death.  This includes the two experts Plaintiff retained for this litigation.  Dr. Dragovic also comes the closest of any professional to linking Kalla's death to an accident when he identifies an earlier injury.  Of course, whether the earlier injury – presumably the fall down the stairs while in Plaintiff's custody – was accidental was never litigated.  Plaintiff's litigation experts here are only willing to say they cannot rule out an accident; not that Kalla's death was accidental.

(*Id.*)   After examining the input they had received from all the doctors, Mr. Badovinac and Mr. Trautner decided it was unlikely the prosecution could persuade a jury beyond a reasonable doubt of Mr. Ferris's guilt, in light of "competing medical opinions."   (ECF No. 200-9, PageID.7772; ECF No. 200-7, PageID.7703.) On November 2014, the Wexford County Prosecutor dismissed the charges with prejudice.  (*Id.*, PageID.7702.)

F.      *This Lawsuit*

Plaintiff filed this lawsuit in June 2015 (ECF No. 1).  Plaintiff's claims against Defendants de Jong, Castellani, and Schmidt arise under 42 U.S.C. § 1983.  Plaintiff contends that the medical opinions the three physicians provided, and on which the police and prosecutors relied in arresting and pursuing charges against Plaintiff, were constitutionally defective.   In connection with this lawsuit, Plaintiff cites the opinions of Drs. Ormsby and Dragovic in the criminal case, as well as expert reports from Drs. Janice Ophoven and Mark J. Shuman, hired for this case.  Dr. Ophoven's report notes that "Kalla Fisher died suddenly and unexpectedly with severe brain swelling and brain herniation associated with bilateral subdural hematoma, subarachnoid hemorrhage and bilateral retinal hemorrhages."  (ECF No. 210-10, PageID.9694.)  She observed that Kalla's "body also showed multiple cutaneous contusions at autopsy.  These findings raise concerns for head injury associated with abuse." (*Id.*)  She determined that "[a]lthough the case has findings raising concerns of a suspicious death, in the final analysis there is insufficient evidence available to determine what happened to the little girl."  (*Id.*, PageID.9696.)  In Dr. Ophoven's opinion, "a full review of the materials that were available at the time of the autopsy should have led to a conclusion that the manner of death was undetermined.  To conclude that this was a homicide based on the materials that were available and the investigation that was performed was far afield of what any reasonable

9

forensic pathologist would conclude from the evidence." (*Id.*)  Dr. Shuman concluded that Kalla

Fisher "died as the result of a blunt head injury."  (ECF 210-12, PageID.9787.)  He found that

Kalla's head injury "could have occurred accidentally or could have been inflicted by an adult or

child." (*Id.*, PageID.9788.)  Like Dr. Ophoven, he concluded that the manner of death could not be

determined.  (*Id.*)  No expert retained in this case has offered an opinion that Kalla's death was, in

fact, an accident.

## LEGAL STANDARDS

"The central purpose of affording public officials qualified immunity from suit is to protect

them 'from undue interference with their duties and from potentially disabling threats of liability.'"

*Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow*, 457 U.S. 800, 806 (1982).

"Qualified immunity protects public officials from liability for civil damages if their conduct does

not violate 'clearly established statutory or constitutional statutory rights of which a reasonable

person would have known.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)

(quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  To determine whether an officer is entitled

to qualified immunity, courts apply a two-tiered inquiry.  *Id.*  "The first step is to determine if the

facts alleged make out a violation of a constitutional right."  *Id.*  "The second is to ask if the right

at issue was 'clearly established' when the event occurred such that a reasonable officer would have

known that his conduct violated it."  *Id.*  The court may address these two steps in any order.  *Id.*

If either factor is not satisfied, qualified immunity shields the officer from damages.  *Id.*

"'[C]learly established law' should not be defined at a high level of generality."  *White v.*

*Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation omitted).  The inquiry "must be taken in light

of the specific context of the case."  *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004) (per curiam).

10

For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. at 552 (internal quotation omitted). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. at — - — , 137 S. Ct. 548, 551 (2015) (internal quotation omitted).

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) (quotation marks omitted). But what about a case where qualified experts honestly draw different conclusions from medical data that all accept as accurate? The Court is aware of no law – clearly established or otherwise – that would expose experts to constitutional liability for that. To the contrary, qualified immunity is designed precisely for such situations to ensure that professionals are willing to engage in the difficult, yet critically important, task of investigating the unexplained death of children while in the custody of their parents or other caretakers.

As long as the medical professionals involved generate and use accurate medical records, and articulate the opinions of what the evidence means honestly and in good faith, qualified immunity should protect them even if their opinions turn out to be wrong. This is an even easier case for qualified immunity because even Plaintiff's litigation experts are unwilling to opine that Kalla's death was, in fact, accidental; rather, the most they will say is that they cannot rule out an accident. The defendants here drew a different conclusion, and Dr. de Jong honestly articulated that at Plaintiff's preliminary examination.[10] They continue to hold the same opinion to this day. Indeed, Kalla's death certificate continues to report homicide as the cause of death. The prosecutor's

---

[10]Neither Dr. Castellani nor Dr. Schmidt testified at Plaintiff's preliminary examination.

ultimate decision to dismiss charges because he did not believe he could persuade a jury of homicide beyond a reasonable doubt does not strip these remaining Defendants of qualified immunity.

### ANALYSIS

Plaintiff's remaining claims are against Defendants de Jong, Castellani, and Schmidt based on Fourth Amendment theories of unlawful seizure and malicious prosecution.[11] The substance of Plaintiff's malicious prosecution claim is that his detention was continued without probable cause in violation of the Fourth Amendment. *See generally Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010); *see also Gregory*, 444 F.3d at 758 (noting that traditional claims for malicious prosecution must be "pursued and treated as Fourth Amendment violations when the gravamen of the complaint is continued detention without probable cause") As applied and focused here, Plaintiff must show that one or more of the defendants "caused his detention to be unlawfully continued by . . . fabricating evidence [or] withholding exculpatory evidence, the absence of either or both of which would have dissolved probable cause for Plaintiff's continued detention." *Id.* at 747. The Court is aware of no Circuit case that exposes a forensic medical examiner to liability for the good faith expression of an opinion based on accurate medical information. The record here shows nothing more, and Defendants are entitled to qualified immunity.[12]

In *Gregory*, a forensic examiner, Ms. Katz, allegedly withheld the existence of evidence that

---

[11]Plaintiff abandoned his other constitutional claims against Defendants de Jong, Castellani, and Schmidt. (*See* ECF No. 210, PageID.9480.) Plaintiff describes his constitutional claim against Sparrow as a policy and practice claim under the *Monell* framework but did not develop this theory in his briefing. The Court sees no factual or legal basis for the claim in the record and dismisses the claim with prejudice.

[12]Because the Court concludes all remaining defendants are entitled to qualified immunity, it is unnecessary to address any of the many other issues presented in the summary judgment briefing.

could have been material to the outcome of a sexual assault trial.  The court observed that if the plaintiff's allegations were correct, then the forensic examiner "deliberately withheld the existence of those two nonmatching hairs . . . [and] cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional rights." *Gregory*, 444 F.3d at 744 (internal quotation marks omitted).  The court saw "no reason to treat the intentional fabrication of a forensic report differently from the intentional fabrication of a police officer or prosecutor." *Id.* at 740.  The court rejected the forensic examiner's argument that she was entitled to qualified immunity because her "'failure to disclose,' if any, amounts only to negligence." *Id.* at 744.  The court explained that the forensic examiner's "culpability is an issue of fact for a jury." *Id.*  The *Gregory* court also rejected the forensic examiner's contention that she was entitled to qualified immunity against the plaintiff's fabrication of evidence claim.  "A review of the record shows that the parties dispute what the evidence shows. Plaintiff's expert reports that Katz's findings are far afield of what any reasonable forensic examiner would find from the evidence; this is sufficient evidence from which a jury might reasonable infer that [the forensic examiner] fabricated her report." *Id*.

Also on point from the Sixth Circuit is *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).  Mr. Moldowan was arrested, prosecuted, and convicted for a 1990 abduction and brutal sexual assault.  *Moldowan*, 579 F.3d at 363.  In 2002, the Michigan Supreme Court reversed his conviction after new evidence emerged and key prosecution witness recanted.  *Id.*  Mr. Moldowan was retried in 2003 and acquitted of all charges after having served twelve years in prison.  *Id.*  In an ensuing civil case, Mr. Moldowan claimed, among other things, that Dr. Alan Warnick, D.D.S., a forensic odontologist, violated the Constitution by fabricating evidence and withholding

exculpatory evidence in the earlier criminal proceedings.  *Id.* at 396.  Acting as a consultant for the Wayne County Medical Examiner and the Macomb County, Monroe County, and Michigan State Police, Dr. Warnick offered expert testimony that bite marks on the victim's neck matched dental impressions taken from Mr. Moldowan.[13]  *Id.* at 365.  Dr. Warnick testified that the chances were 2.1 billion to 1 that a different individual could make the same marks.  *Id.*  After the defense presented its case, the prosecution called Dr. Warnick's colleague, Dr. Pamela Hammel, D.D.S., who provided testimony that supported Dr. Warnick's conclusions.  *Id.*  Years later, Dr. Hammel recanted her testimony.  She "explained that she initially had trouble matching the defendants' dentitions to the bite marks on [the victim's] body, but that Dr. Warnick had reassured her that Dr. Norman Sperber, a highly respected forensic odontologist, had reviewed the evidence and confirmed Dr. Warnick's conclusions."  *Id.*  After learning that Dr. Sperber had never reviewed evidence in the case, Dr. Hammel deduced that Dr. Warnick had deceived her to convince her to testify in support of his conclusions.  *Id.*

Mr. Moldowan claimed that Dr. Warnick violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.  *Id.* at 396.  He alleged that Dr. Warnick "either intentionally or with deliberate indifference and/or with reckless disregard of the truth and of [Moldowan's] constitutional rights, fabricated evidence and withheld impeaching and exculpatory evidence from the Macomb County Prosecutor and from [Moldowan's] defense counsel."  *Id.* (quotation marks omitted).  On an interlocutory appeal, the Sixth Circuit found that, "assuming the facts as asserted by Moldowan, the legal norms allegedly violated by the defendant were clearly established at the time of the

---

[13]Dr. Warnick also testified that bite marks on the victim's right arm and right side were consistent with Mr. Moldowan's co-defendant's dentition.  *Id.* at 365.

14

challenged action." *Id.* at 397.   In reaching its decision, the court summarized *Gregory* as concluding that "a forensic expert may be subject to suit under § 1983 for deliberately withholding the existence of exculpatory forensic evidence or fabricating forensic evidence." *Id.*

The Ninth Circuit explored similar issues in *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).  Mr. Galbraith was charged with murdering his wife, Josephine, by strangling her.  Central to the charging decision and prosecution was the coroner, Dr. Ozoa's, conclusion that the cause of death was "asphyxia due to ligature strangulation by an assailant." *Galbraith*, 307 F.3d at 1122.  Mr. Galbraith was tried for murder and acquitted.  *Id.*  After his acquittal, Josephine's body was exhumed.  *Id.*  An expert examined the body and determined that "Dr. Ozoa could not have examined key internal neck structures that Dr. Ozoa claimed to have examined in the autopsy report." *Id.*  The expert "opined that close examination of these structures would have been central to any forensic determination that the cause of death was ligature strangulation by an assailant." *Id.* Mr. Galbraith's amended complaint alleged that the coroner "deliberately lied about the autopsy in the autopsy report, in his communications with other investigators, and on the witness stand at the preliminary hearing in order to cover up his incompetence, and that these lies proximately caused Galbraith's arrest and prosecution for murder." *Id.*  "[W]e agree . . . that a coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth Amendment." *Galbraith*, 307 F.3d at 1127.  The court concluded that the amended complaint "adequately allege[d] a Fourth Amendment violation." *Id.*

The Tenth Circuit reached similar conclusions in *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004).  In *Pierce*, the plaintiff alleged that forensic examiner Joyce Gilchrist falsely identified

33 scalp and pubic hair samples from the scene of a rape as "microscopically consistent" with evidence taken from Mr. Pierce's body. *Pierce*, 359 F.3d at 1282. The plaintiff alleged that Ms. Gilchrist's findings "were false and without any scientific basis." *Id.* He also alleged that "with knowledge and deceit, Ms. Gilchrist . . . concealed the fact that Mr. Pierce's hair did not match the hairs found at the crime scene . . . [and] disregarded her own findings that Mr. Pierce's blood contained a particular enzyme, PGM-2-1, which conclusively precluded Mr. Pierce from being the source of the sperm found on the victim." *Id.* The court found that Mr. Pierce had satisfied the pleading requirements, emphasizing that Mr. Pierce "alleges that Ms. Gilchrist, with knowing and reckless disregard for the truth, informed the police and prosecutorial authorities that the hair analysis supported Pierce's involvement in the rape – even though in fact, far from implicating him in the rape, the hair analysis tended to exonerate him – and disregarded findings that Mr. Pierce's blood contained an enzyme that exonerated him of being the source of the sperm found on the rape victim." *Id.* at 1293-94.

The common theme of *Gregory*, *Maldowan*, *Galbraith*, and *Pierce* is that experts who fabricate evidence; purposely alter, withhold, or spoil evidence; or purposely lie about their work and opinions may well be held to account for a wrongful prosecution that results from their misconduct. That is a far cry from opening the door to potential liability for experts who honestly form and express opinions that support a criminal prosecution, even if contrary opinion testimony ultimately persuades a prosecutor not to pursue charges, or a fact-finder to acquit.

A recent Fifth Circuit case illustrates the point. Two exonerated plaintiffs brought claims under Section 1983 against two forensic experts who had testified for the prosecution regarding bite marks on victims' bodies. *Brewer v. Haynes*, Nos. 16-60116, 60341, — F.3d. — , 2017 WL

16

2784155 (5th Cir. 2017).  The plaintiffs urged the court to find a triable question of fact as to whether the defendants had "intentionally created false or scientifically inaccurate bite mark evidence" based on evidence including, without limitation:

> (1) other expert opinions that have concluded that there was 'no scientific basis' for determining the contusions on the bodies were bite marks . . .; (2) other expert opinions that determined that finding nineteen bite marks made only with the upper teeth is 'unreasonable and unprecedented;' (3) a previous case where an expert for the defense testified that he believed there was no bite mark present until [defendant forensic examiner], in an effort to match a mold of the accused's teeth to the supposed mark, pressed the mold into the flesh; (4) the 'extraordinary frequency' with which Defendants found bite mark evidence . . . [and] (5) Defendants' failure to produce any other experts who agreed with their conclusions.

*Brewer*, 2017 WL 2784155 at *4.  The court observed that this amounted to "a compelling showing that Defendants were negligent in their forensic analysis" but that "negligence alone will not defeat qualified immunity."  *Id.*  The court found that "[t]he disagreement voiced by Plaintiffs' experts is evidence that Defendants were mistaken in their conclusions or methodologies, but no more."  Id. The defendants were entitled to qualified immunity.  *Id.*

The case for qualified immunity in favor of Defendants de Jong, Castellani, and Schmidt is even stronger here than in *Brewer*.  In this case, there is simply no evidence of knowing fabrication of evidence, and no showing that defendant physicians knowingly withheld exculpatory evidence.  Nothing about the Plaintiff's experts' opinions suggests that any of the defendant physicians engaged in deliberate wrongdoing.  To the contrary, they rely on the medical records created by Defendants and simply disagree with some, though not all, of the conclusions.  Drs. Ophoven and Shuman say that the medical records alone do not rule out the possibility of an accidental death, and that Defendants were wrong to classify the death as homicide.  But even these Plaintiff's experts do not opine the death was in fact an accident.  Nor do Plaintiff's experts suggest that Defendants are less

than honest in their expression of belief that the death was homicide.  Indeed, that is still the opinion of the medical examiner on Kalla's death certificate.

Plaintiff protests that Dr. de Jong's opinion that an acute injury caused Kalla's death was so "far afield" it amounted to fabricated evidence.[14]  These words appear in the report of Plaintiff's experts and are drawn from *Gregory*.  But constitutional liability does not turn on the presence or absence of some magic verbal formulation; it turns on what the record permits a reasonable fact-finder to conclude, and how any such conclusion stacks up against clearly established constitutional rules.  Nothing in *Gregory* – or any other Circuit case – suggests that an expert's honest expression of opinion based on accurate medical records opens the door to liability.  If the law permitted that, it is hard to see how a prosecutor could ever get any professional to express an opinion.  Qualified immunity is tailor made for this kind of situation.

Defendants de Jong, Castellani, and Schmidt are entitled to qualified immunity because the record does not support that they did anything beyond honestly form and express their opinions – opinions they continue to hold – that Kalla's death was a homicide based on an accurate and unaltered medical record, and on their experiences in similar situations.  Even if their opinions are mistaken – an open question on this record – they are entitled to qualified immunity.

---

[14]Plaintiff also points to Dr. de Jong's statements  that only an adult-size person could have inflicted the injury as fabricated evidence.  But Dr. de Jong's Autopsy Report does not state that only an adult-size person could have inflicted the injury.  A review of Dr. de Jong's testimony at the Preliminary Examination reveals that she stopped well short of opining that only an adult-size person could have inflicted the injury.  When asked if a seven year old, or a child, could have inflicted the injury, she says "I don't believe that," but she does not rule out the possibility.

**CONCLUSION**

For these reasons, summary judgment in favor of the remaining defendants is appropriate.


Dated:    July 14, 2017          /s/ Robert J. Jonker
                                 ROBERT J. JONKER
                                 CHIEF UNITED STATES DISTRICT JUDGE